# AFFIDAVIT
# OF
# JASON W. BAILLARGEON
# TASK FORCE OFFICER
# DRUG ENFORCEMENT ADMINISTRATION

I, Jason W. Baillargeon, being duly sworn, do depose and state that:

1. I am a federally deputized Task Force Officer ('TFO") with the Drug Enforcement Administration ("DEA") assigned to the DEA Jefferson City Office since November 2015. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1). I am a police detective assigned to the Vice, Narcotics and Organized Crime Unit of the Columbia Police Department (CPD), and have been a police officer for over twenty (20) years.

2. While with the DEA, I have participated in drug trafficking[1] investigations involving, among other crimes, the manufacture and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); the unlawful use of a communications device to commit and facilitate the commission of drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); drug trafficking conspiracies, in violation of Title 21, United States Code, Section 846; money laundering, in violation of Title 18, United States Code, Section 1956 and 1957; conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); the possession of firearms by felons and other prohibited persons, in violation of Title 18, United States Code, Section 922(g), and the possession of firearms in

---

[1] As used in this affidavit, "drug trafficking" means any felony defined and punishable under Title 21, United States Code, Section 801, et seq., and Title 21, United States Code, Section 951, et seq.

furtherance of drug trafficking offenses and/or crimes of violence, in violation of Title 18, United States Code, Section 924(c).

3. During my career as a law enforcement officer, I have participated in numerous drug and firearms investigations, either as a case agent or in various support roles at both the state and federal level. I have received specialized training on the subject of firearms, and the possession, manufacture and distribution of controlled substances. My training and experience has also involved, physical surveillance, the execution of search warrants, interviews of witnesses, and the arrests and interviews of felony and misdemeanor defendants. On numerous occasions, I have spoken with witnesses, suspects, defendants and investigators concerning the methods and practices used by violent offenders and/or drug traffickers in carrying out their unlawful activities, including methods of concealment in order to avoid detection. Through these investigations, my training, experience, conversations with experienced agents, other investigators and law enforcement personnel, I am aware that drug traffickers and violent offenders use firearms for protection of their person(s) and their business(es), and for intimidation, in order to bolster their image and maintain their reputation and status within the criminal community. Drug traffickers and violent offenders are often robbed of their unlawful products, shot at, injured, and as a result commit retaliatory acts of violence. I am also aware that drug traffickers will sometimes rob other drug traffickers of their money and/or controlled substances. I am familiar with the methods employed by drug traffickers in general to smuggle, safeguard and distribute drugs, and to collect and launder drug-related proceeds. These methods include the use of debit calling cards, public telephones, wireless communications technology such as cellular telephones and text messaging, counter-surveillance, elaborately planned smuggling schemes tied to otherwise legitimate

businesses, false or fictitious identities, and coded communications in an attempt to avoid detection by law enforcement and circumvent investigations, and also to avoid alerting ordinary citizens. When using cellular telephones, I am aware that the methods employed by drug traffickers include the use of false names to obtain cellular telephones, use of numerous cellular telephones, dropping and/or changing cellular telephone numbers, and using code words when talking on cellular telephones and/or using text messaging.

4. In support of this Application for Search Warrant, I state that based upon my training, experience, and participation in other investigations involving cocaine, cocaine base "crack", marijuana, heroin, methamphetamine and/or other controlled substances, that persons engaged in large scale drug trafficking organizations typically have the following items on hand at their homes and locations where they store, sell and distribute controlled substances:

   a) Large amounts of U.S. currency reflecting receipts from drug dealing and/or funds used to procure additional drugs for resale;
   b) Records detailing the receipt and subsequent sale of drugs, and also reflecting amounts of money paid, received, and/or due from purchasers or suppliers of drugs;
   c) Triple-beam, digital, or other types of scales used to weigh quantities of drugs;
   d) Plastic bags, plastic, and other materials used to package drugs for resale;
   e) Firearms or other weapons used to protect large amounts of drugs and/or United States currency, or the premises, or participants in the conspiracy;
   f) Financial records (such as automobile titles, automobile insurance records, real estate purchases, and rental records, bank statements, checks, bank account passbooks, receipts, money order and cashier's check copies, wire transfers, deposit items, bank drafts, certificates of deposit, financial statements, loan records, payment journals, false identifications used to acquire assets or make expenditures in alias or nominee names) which reflect the purchase of assets (both personal and real property) and making of personal expenditures using the profits generated from the illegal sale of drugs;
   g) Various cutting agents, such as other controlled and non-controlled substances, used to dilute methamphetamine, marijuana and synthetic marijuana prior to its resale in order to generate additional profits;
   h) Photographs showing themselves and/or other persons engaged in drug trafficking;
   i) Addresses and telephone books listing the names and addresses of the associates, suppliers, and customers of the drug trafficker;

3

- j) Tickets, schedules, papers, notes, receipts, and other items relating to domestic or foreign travel;
- k) Keys or records reflecting the rental or location of safe deposit boxes, mail drops and storage units;
- l) Electronic paging devices and/or cellular telephones utilized in the drug trade; and
- m) Computers, computer software, and computer diskettes utilized to maintain financial records.

5. I further state that based on my training, experience, and participation in other investigations involving methamphetamine, marijuana, and synthetic marijuana and/or other controlled substances:

- a) Drug traffickers very often place assets in names (individuals and/or corporate) other than their own to avoid detection of these assets by government agencies;
- b) Drug traffickers very often possess firearms for protection of the unlawful business, and frequently hide the firearms on the premises where they reside and/or where the unlawful business is being conducted;
- c) Although these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;
- d) Drug traffickers frequently maintain, on hand, large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;
- e) Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances; drug traffickers commonly consign controlled substances to their clients and transporters; that the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the traffickers have ready access to them;
- f) It is common for drug traffickers to secrete contraband, proceeds of drug sales, and records of drugs transactions in secure locations within their residences, out buildings, sheds, hidden compartments in vehicles and/or their business locations for their ready access and to conceal them from law enforcement authorities;
- g) It is common for drug traffickers to conceal in their residences and businesses controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating to: obtaining, transferring, secreting, or the spending of large amounts of money made from engaging in narcotics trafficking activities;
- h) Drug traffickers amass large proceeds from the sale of drugs, and they attempt to legitimize these profits. To do so, drug traffickers utilize domestic banks and their attendant services, including but not limited to, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts;

4

i) Drug traffickers commonly keep in books or on papers: names, addresses and telephone numbers of their associates in the illicit trafficking business;
j) Drug traffickers often carry weapons to protect themselves and their controlled substances from theft by other trafficking organizations and seizure by law enforcement agencies, and hide these weapons in homes and other areas where money and controlled substances are stored; and
k) Drug traffickers often use cellular telephones and other forms of electronic communications to contact their associates, place orders for narcotics, and control the delivery of illegal contraband.

6. The following information is based upon my personal knowledge as well as information provided to me by other federal, state and local officers and is presented as probable cause for a search warrant authorizing the search of 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri for the items listed in Attachment B. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and does not set forth all of my knowledge about this matter. The following is a summary of the investigation:

7. On July 27, 2018, and again on August 29, 2018, a United States District Judge for the Western District of Missouri signed orders, which authorized the interception of wire and electronic communications on (573) 864-4369, a T-Mobile telephone utilized by JEROME RAINEY. Investigators initiated the interception of wire and electronic communications on July 30, 2018, which terminated after 11:59 p.m. on September 27, 2018. The orders authorized the interception of electronic and wire communications regarding, among others, the conspiracy to manufacture and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); the unlawful use of a communications device to commit and facilitate the commission of drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); drug trafficking conspiracies, in violation of Title 21, United States Code, Section 846; money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957;

5

Case 2:18-sw-03113-WJE   Document 1-1   Filed 11/13/18   Page 5 of 15

conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h); the possession of firearms by felons and other prohibited persons, in violation of Title 18, United States Code, Section 922(g), and the possession of firearms in furtherance of drug trafficking offenses and/or crimes of violence, in violation of Title 18, United States Code, Section 924(c).

8. On October 17, 2018, a United Stated District Judge for the Western District of Missouri signed an order which authorized the interception of wire and electronic communications on (573) 303-1911, a Sprint telephone utilized by RODNEY ARNOLD. Investigators initiated the interception of wire and electronic communications on October 18, 2018, which are scheduled to terminate after 11:59 p.m. on November 16, 2018. This order authorized the interception of wire and electronic communications regarding the same target offenses listed above in ¶ 7.

9. Based upon my experience in this investigation, particularly the monitoring of wire and electronic interceptions, and surveillance of individuals targeted in this investigation, I have confirmed that BILAL HILL resides at 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri, and is a dealer of marijuana and synthetic marijuana (commonly referred to as K2), and other controlled substances. I believe HILL works in conjunction with ARNOLD and DEMARCUS CAIN (a/k/a "DC"). I also believe HILL stores, repackages and distributes marijuana and synthetic marijuana, United States Currency, and proceeds obtained by illegal means, such as the repetitive sale of controlled substances, at 2800 South Providence Road, Apt. 1B, Columbia, Boone County Missouri. In part, my statements are based upon my experience and that of others monitoring the interceptions set forth below. Some of the phone calls have been

6

summarized and interpreted when either slang or code was used. In certain calls, the pertinent sections have been quoted verbatim, particularly when no interpretation was required.

10. On October 19, 2018, at approximately 12:34 p.m., ARNOLD called HILL and asked if HILL had a "Clock" (slang term for a scale) "over there" (meaning HILL's residence at 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri). Based on my training, experience and knowledge of this investigation, I believe HILL had possession of a scale which he uses for the storage, packaging and distribution of marijuana or synthetic marijuana at his residence. Based upon my training, experience and knowledge of this investigation, this call to HILL was made subsequent to ARNOLD's own admission to others, via other intercepted telephone calls, that he had stolen a large amount of controlled substances, specifically a "peanut" (believed to be a code word for a pound of controlled substances).

11. On October 21, 2018, at approximately 3:48 p.m., ARNOLD called HILL, who stated he had a source of supply for synthetic marijuana ("I got that ear nigga") and it was of good quality ("I got some lay me down nigga"). ARNOLD and HILL discussed the source of supply and ARNOLD stated, "he ran up on me in traffic about selling me a whole zip. Nigga I don't need a whole zip, I hurt myself with a whole zip of that shit." Based on my training, experience and knowledge of this investigation, I believe HILL had a source of supply for synthetic marijuana, and ARNOLD indicated his source of supply had contacted him and attempted to sell him a whole ounce of what agents believe to be controlled substances. ARNOLD responded he did not want the whole ounce because, with that much, he had the potential to hurt himself.

12. On October 24, 2018, at approximately 4:56 p.m., HILL called ARNOLD and asked, "you got some smokies?" and ARNOLD responded he had "twenty four." HILL stated he

7

had "someone" that wanted to purchase a "half pack." Based on my training, experience and knowledge of this investigation, I believe HILL wanted to purchase wanted to purchase ("smokies") and, in turn, sell it to an unidentified person.

13.     On October 26, 2018, at approximately 11:25 p.m., ARNOLD called HILL and asked where HILL was. HILL stated he was at "home, coolin'." ARNOLD asked, "you got some smoke?" and HILL responded, "Yeah, always." HILL stated, "hey, listen man, I'm even keel all the time, you feel me? Everybody loves me. You know what I'm sayin'? I keep flavor and it just don't change. You know what I'm talking about? My shoes is wet. You know what I'm saying? Holler at me when you get ready, you know what I'm saying?" Based on my training, experience and knowledge of this investigation, I believe ARNOLD called HILL for marijuana and HILL stated he "always" has marijuana ("hey, listen man, I'm even keel all the time, you feel me? Everybody loves me. You know what I'm sayin'? I keep flavor and it just don't change. You know what I'm talking about?) I also believe HILL stated he would sell marijuana to ARNOLD when he was ready ("Holler at me when you get ready, you know what I'm saying?").

14.     On November 1, 2018, at approximately 9:18 a.m., ARNOLD called HILL's phone and stated, "Police outside your house boy." The person who responded was believe to be DURAN JONES, who indicated that HILL was "havin' an episode" and had been having the episode "for forty five minutes and he can't come out of it." Law enforcement was summoned to the scene and identified JONES, TYHESIA BRIMMAGE and HILL at the residence. Based on my training, experience and knowledge of this investigation, I believe HILL had been ingesting synthetic marijuana ("K2") and had an overdose reaction for which he required medical assistance.

8

15. On November 1, 2018, at approximately 12:48 p.m., BRIMMAGE called ARNOLD, and they discussed what I believe to be the effects of the synthetic marijuana HILL overdosed with that morning, based on other people's usage of the same strain of synthetic marijuana. ARNOLD stated he had to "do Dragos the same way, man, I had just slam that nigga on my momma's floor" after he ingested what agents believe to be the same synthetic marijuana. BRIMMAGE discussed a similar situation with a subject she identified as "Mike Lawrie," stating, "you just gotta know your limit. That's it, just tag the mutha fucka man and get high. Like they don't gotta get greedy high." I believe this conversation concerned the ingestion of synthetic marijuana and what had to be done by ARNOLD and BRIMMAGE to calm "Dragos" and "Mike Lowrie" down after the synthetic marijuana was ingested. I also believe HILL, ARNOLD and BRIMMAGE are involved in the usage and distribution of synthetic marijuana causing overdose reactions to people in the Columbia, Boone County, Missouri area.

16. On October 31, 2018, at approximately 6:14 p.m., ARNOLD called HILL and asked, "you at the house" (2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri). HILL stated he was and ARNOLD asked, "you still on deck?" HILL responded, "yup," and ARNOLD advised, "Let me slide on you." Based on my training, experience and knowledge of this investigation, I believe ARNOLD wanted to know if HILL had any marijuana to sell ("you still on deck?"). I believe HILL acknowledged he had marijuana for sale, and ARNOLD advised he would come over to HILL's residence to purchase the marijuana.

17. On November 5, 2018, at approximately 11:49 a.m., HILL called ARNOLD and during their conversation, HILL claimed he had not heard from ARNOLD since ARNOLD left HILL's residence with "that motherfucking thundercat on your hip" (firearm). ARNOLD asked if

9

HILL had "that same shit" (the same synthetic marijuana that caused HILL to overdose previously). HILL stated he still had "that heat." ARNOLD then warned HILL he needed to "put some cut on that shit" before "you kill a nigga." HILL explained ARNOLD just needed to "roll joints like he was in the penitentiary" by adding some "tobacco or some black and mild" to the joint along with the synthetic marijuana. ARNOLD continued to talk about the strength of the product, stating it was "so strong, nigga you could turn one zip into two." Based on my training, experience and knowledge of this investigation, I believe HILL and ARNOLD were discussing the strength of the synthetic marijuana that caused HILL and others to overdose. I also believe HILL and ARNOLD discussed needing to dilute the synthetic marijuana before someone died due to an overdose, while also inflating the weight of the product to maximize profit through its distribution.

18. On November 8, 2018, at approximately 12:54 p.m., DEMARCUS CAIN called ARNOLD and during their conversation, CAIN stated, "Hey, they had a thing in the paper, bro." ARNOLD asked, "What? About K2?" CAIN continued that there has been "Hella overdoses" and claimed, what I believe to be the source of the K2 causing the overdoses, "I called him this morning. I said bro it's Fentanyl in that shit. That's what's makin' them muhfuckas drop." CAIN claimed the source "didn't say shit. Didn't say nothin'. Changed the whole subject" when CAIN confronted him about the presence of Fentanyl in the K2. Arnold interrupted, "Fentanyl, Fentanyl makin' people (unintelligible)." CAIN laughed and stated the K2 was "makin' 'em go outside they body." CAIN continued to talk about the person, whom I believe is the source of the K2, was "on one" when CAIN called. CAIN also described meeting with this unidentified source the last time the source was under the influence of the substance when he stated, "If you could have seen

10

him with that pistol, bro, you'd been like uh, uh. He was on some bullshit." Based upon my training, experience and knowledge of this investigation I believe CAIN and ARNOLD were discussing the synthetic marijuana that was currently causing several overdoses in the Columbia, Boone County, Missouri area. I also believe CAIN and ARNOLD were mutually talking about the source of the synthetic marijuana who was utilizing Fentanyl to increase the effect from ingesting the substance and in turn causing people to overdose.

19. On November 9, 2018, CPD officers spoke with Crenda Hill (estranged-wife of BILAL HILL), who stated HILL was selling "K2." Crenda advised she had a relative contact her who stated they had purchased "K2" from HILL and overdosed on the substance. Crenda stated HILL was currently living with TYHESIA BRIMMAGE.

20. On November 10, 2018, CPD Lieutenant Geoff Jones was contacted by a reliable Confidential Source ("CS") who stated HILL was selling "K2" from the same residence HILL had recently overdosed. I believe the CS was referencing the November 1, 2018 incident where CPD responded to HILL exhibiting behaviors associated with a drug overdose at **2800 South Providence Road, Columbia, Boone County, Missouri**.

21. On November 11, 2018, between approximately 3:42 p.m. and 6:19 p.m., surveillance observed several vehicles coming to and from HILL's residence at 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri. In each instance, an occupant of the vehicles entered into HILL's residence and stayed for a brief period before exiting and driving away from the residence. Based upon my training, experience and knowledge of drug investigations, I know frequent and brief contact at a residence is an indicator of controlled substance distribution. At approximately 6:12 p.m. surveillance observed a vehicle arrive at 2800

South Providence Road, Apt. 1B, Columbia, Boone County, Missouri, and saw a black male exit the vehicle and enter HILL's apartment. At approximately 6:18 p.m., surveillance observed a black male exit the residence and re-enter the gold colored passenger car. At approximately 6:19 p.m., surveillance observed the vehicle turn onto Carter Road without using its turn signal and requested a CPD patrol vehicle to conduct a traffic stop. At approximately 6:20 p.m., CPD officer Jameson Dowler and Mark Fitzgerald conducted a traffic stop on the vehicle near the intersection of Providence Road and Carrie Francke Drive. The driver of the vehicle was identified as Nichole Wright, the front seat passenger was identified as Phillip Porter and the rear seat passenger was identified as DURAN JONES. Officer Dowler asked Wright why the occupants of the vehicle were nervous, Wright stated JONES had "K2" on his person. Detective Fitzgerald asked Porter and Jones to exit the vehicle. Porter took off his coat before exiting the vehicle and was only wearing a short-sleeved shirt. Detective Fitzgerald noted this behavior was highly unusual due to the fact that the outside temperature at the time was approximately 39 degrees and Porter had just made statements about how cold it was prior to being asked to exit the vehicle. As Jones exited, officer Dowler observed a plastic bag with plant material consistent with the appearance of "K2" (a street name for synthetic marijuana) sitting on the seat under where JONES had been sitting. While Officer Dowler was securing JONES in handcuffs, JONES made a spontaneous utterance to the effect of "that's my K2" and "I smoke K2." After JONES was detained in a patrol vehicle, Porter indicated he wanted his jacket. Officer Fitzgerald retrieved Porter's jacket from the vehicle and searched the jacket prior to giving it to Porter. Inside the left breast jacket pocket, a small cigar and folded up paper both containing a green leafy plant substance consistent with the appearance of "K2". During an interview conducted by Detective Fitzgerald, Wright and Porter

12

both acknowledged giving JONES a ride from his sister's house, but neither provided a specific address or identity for JONES' sister. I believe based upon my training, experience and knowledge of this investigation JONES' sister to be TYHESIA BRIMMAGE and this confirms JONES had recently left BRIMMAGE's residence 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri. I also believe JONES traveled to and from BRIMMAGE and HILL's residence with Wright and Porter to purchase synthetic marijuana.

22. BRIMMAGE is listed as the subscriber of all utilities at 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri. In addition, HILL is currently under supervision by the Missouri Department of Probation and Parole, and the Missouri Department of Corrections shows HILL's address is 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri. BRIMMAGE and HILL have a child in common and HILL is believed to be living with BRIMMAGE at the above address.

23. Based upon all of the above, I believe HILL's involvement in drug trafficking is extensive, and probable cause exists that evidence of the conspiracy to distribute marijuana and synthetic marijuana, among other controlled substances, will be found at 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri.

24. I believe the investigation, evidence, and the above-intercepted communications show there is probable cause to believe that HILL is storing bulk quantities of marijuana, synthetic marijuana, and possibly other controlled substances, United States Currency, and proceeds of drug distribution at 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri, to facilitate these drug transactions.

25. I further believe that there is probable cause to believe that HILL and others have been committing offenses involving the distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); the unlawful use of a communications device to commit and facilitate the commission of drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); drug trafficking conspiracies, in violation of Title 21, United States Code, Section 846; money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957; conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h); the possession of firearms by felons and other prohibited persons, in violation of Title 18, United States Code, Section 922(g), and the possession of firearms in furtherance of drug trafficking offenses and/or crimes of violence, in violation of Title 18, United States Code, Section 924(c).

26. Based upon all of the above, I believe there is probable cause that evidence of the commission of the above listed offenses will be found at 2800 South Providence Road, Apt. 1B, Columbia, Boone County, Missouri.

27. The facts set forth in this affidavit are true and correct to the best of my knowledge and belief.

Further, affiant sayeth not.

_____
JASON W. BAILLARGEON
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me via telephone on this, the 13th day of November, 2018.

_____
**Willie J. Epps, Jr.**
United States Magistrate Judge

15